**No. 25-30644**

# In the United States Court of Appeals for the Fifth Circuit

JOEL GIROIR, ON BEHALF OF HIMSELF AND ALL
SIMILARLY SITUATED INDIVIDUALS,
*Plaintiff-Appellee,*

v.

JAMES M. LEBLANC, SECRETARY, DEPARTMENT OF PUBLIC SAFETY AND
CORRECTIONS; LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND
CORRECTIONS,
*Defendants-Appellants.*

**FROM THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
NO. 3:21-CV-108, HON. JOHN W. DEGRAVELLES**

**APPELLEE'S BRIEF**

CECELIA TRENTICOSTA KAPPEL
SAMANTHA POURCIAU
THE PROMISE OF JUSTICE INITIATIVE
1024 Elysian Fields Avenue
New Orleans, LA 70117
Tel:  (504) 529-5955
*ctkappel@defendla.org*
*sbosalavage@defendla.org*

WILLIAM MOST
MOST & ASSOCIATES
201 St. Charles Ave. Ste. 2500 #9685
New Orleans, LA 70170
Tel:  (504) 509-5023
*williammost@gmail.com*

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF INTERESTED PERSONS

———————————

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

| Parties | Counsel and Law Firms |
|---|---|
| PLAINTIFF-APPELLEE<br>Joel Giroir | PROMISE OF JUSTICE INITIATIVE<br>Cecelia Trenticosta Kappel<br>Samantha Pourciau<br>Michael Allen<br><br>MOST & ASSOCIATES<br>William Most<br>Caroline Gabriel<br><br>LOEVY & LOEVY<br>Brian Morris |
| DEFENDANTS-APPELLANTS<br>James LeBlanc, Secretary, Department of Public Safety and Corrections; Louisiana Department of Public Safety and Corrections | KEOGH, COX & WILSON, LTD.<br>Andrew Blanchfield<br>Chelsea A. Payne<br><br>ATTORNEY GENERAL OF LOUISIANA<br>Elizabeth B. Murrill<br>J. Benjamin Aguiñaga<br>Morgan Brungard<br>Elizabeth Brown |

/s/ *Cecelia Trenticosta Kappel*
CECELIA TRENTICOSTA KAPPEL
*Counsel of for Appellee*

APRIL 6, 2026.

iii

## STATEMENT REGARDING ORAL ARGUMENT

Appellee respectfully submits that oral argument is unnecessary in this case. The district court's certification order is based on well-established legal principles and factual findings routinely made in the context of class certifications. Further, there is nothing novel about a federal court applying Rule 23 factors to certify a class when a state policy or practice is violating the Constitution on a class-wide basis. As such, the Court can resolve this case on the well-developed record. Oral argument is unnecessary to aid the Court's decisional process.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................ii

TABLE OF AUTHORITIES....................................................................vii

INTRODUCTION.................................................................................. 1

STATEMENT OF THE ISSUES.................................................................4

STATEMENT OF THE CASE ..................................................................5

    I.   DPSC is Responsible for Every Individual in  Its Custody.............6

    II.    History of the Overdetention Crisis in Louisiana. .......................7

    III.   "Total Chaos": How DPSC Calculates Time. ............................12

    IV.   Joel Giroir Was Illegally Incarcerated for 27 Days in  DPSC Custody. ..........................................................................................15

    V.    Procedural History. ..................................................................17

        A.    The Complaint and Motion for Class Certification. ................17

        B.    Evidentiary Hearing on Class Certification. ...........................19

        C.    District Court Certifies the Class. ...........................................21

SUMMARY OF ARGUMENT ................................................................21

STANDARD OF REVIEW.....................................................................23

ARGUMENT .......................................................................................24

    I.   Sovereign Immunity Does Not Apply to DPSC. ...........................24

        A.    DPSC Waived Sovereign Immunity........................................25

        B.    DPSC Cannot Raise Sovereign Immunity Under  Rule 23(f). 30

C.     DPSC's Sovereign Immunity Does Not Impact Class Certification or the Underlying Merits of the Case..........................32

II.     The District Court Properly Certified the State-Law Claims....33

III.    The Giroir Class is Not Moot. ......................................................35

A.     Giroir's Motion for Class Certification was Pending When his Claim Became Moot. .......................................................................40

B.     Appellants' Purported "Changed Circumstances" Cannot Moot the Case. ...........................................................................................45

C.     Overdetention Is Inherently Transitory.................................47

D.     The Overdetention Policy Evades Review Despite the Certification of the *Humphrey* Damages Class. ..............................50

IV.    The District Court Did Not Abuse Its Discretion Applying Rule 23's Factors to the *Giroir* Class. ..........................................................52

A.     *Giroir* is an Adequate Representative for His Class. ...............52

B.     The Class Satisfies the Requirements of Rule 23(b)(2)...........58

C.     Appellee Presented Sufficient Evidence of Commonality and Typicality Within the Class. ..........................................................62

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*50-Off Stores, Inc. v. Banques Paribas (Suisse), S.A.,*
   180 F.3d 247 (5th Cir. 1999)...............................................................54

*Alvarez v. Smith,*
   558 U.S. 87 (2009)...............................................................................52

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,*
   568 U.S. 455 (2013)........................................................................ 46, 56

*Angell v. GEICO Advantage Ins. Co.,*
   67 F.4th 727 (5th Cir. 2023) ...................................................... 55, 57, 64

*Bd. Of Regents of Univ. Of Wisconsin Sys. v. Phoenix Int'l Software, Inc.,*
   653 F.3d 448 (7th Cir. 2011)...............................................................29

*Bell v. Ascendant Sols., Inc.,*
   422 F.3d 307 (5th Cir. 2005).........................................................23, 30

*Bertulli v. Indep. Ass'n of Continental Pilots,*
   242 F.3d 290 (5th Cir. 2001)...................................................... 26, 30, 31

*Buchicchio v. LeBlanc,*
   No. 23-30116, 2024 WL 4603272
   (5th Cir. Oct. 29, 2024) .......................................................................49

*Bumgarner v. NCDOC,*
   276 F.R.D. 452 (E.D.N.C. 2011)...........................................................58

*Castano v. Am. Tobacco Co.,*
   84 F.3d 734, 740 (5th Cir. 1996) .........................................................26

*Celanese Corp. v. Martin K. Eby Constr. Co.,*
   620 F.3d 529 (5th Cir. 2010)...............................................................54

*Champagne v. Jefferson Parish Sheriff's Office*,
   188 F.3d 312 (5th Cir. 1999)..................................................................24

*City of Los Angeles v. Lyons*,
   461 U.S. 95, 109 (1989)...................................................22, 50, 51, 52

*Clark v. Barnard*,
   108 U.S. 436 (1883).............................................................................25

*Cleven v. Mid-America Apartment Cmtys., Inc.*,
   20 F.4th 171 (5th Cir. 2021) ...................................................23, 24, 62

*Cole v. Livingston*,
   Civil No. 14-1698, 2016 WL 3258345
   (S.D. Tex. June 14, 2016)....................................................................58

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
   527 U.S. 666 (1999).............................................................................25

*Corn v. Mississippi Dep't of Pub. Safety*,
   954 F.3d 268 (5th Cir. 2020).........................................................33, 34

*County of Riverside v. McLaughlin*,
   500 U.S. 44 (1991)........................................................................*passim*

*Crittindon v. LeBlanc*,
   37 F.4th 177 (5th Cir. 2022) ...........................................................5, 49

*Def. Distributed v. Grewal*,
   971 F.3d 48 (5th Cir. 2020)..................................................................54

*Dockery v. Fischer*,
   253 F. Supp. 3d 832 (S.D. Miss. 2015) ...............................................60

*Dukes v. Wal-Mart Stores, Inc.*,
   603 F.3d 571 (9th Cir. 2010)...............................................................57

*Earl v. Boeing Co.*,
53 F.4th 897 (5th Cir. 2022) ................................................................ 31

*Ebanks v. Shulkin*,
877 F.3d 1037 (Fed. Cir. 2017) .......................................................... 65

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974) ............................................................................ 56

*Ex Parte Young*,
209 U.S. 123 (1908) ........................................................ 2, 21, 32, 33

*Fontenot v. McCraw*,
777 F.3d 74 (5th Cir. 2015) ..................................................... *passim*

*Fox v. Saginaw Cnty., Michigan*,
67 F.4th 284 (6th Cir. 2023) .............................................................. 30

*Gerstein v. Pugh*,
420 U.S. 103 (1975) ................................................... 39, 47, 50, 58

*Gen. Tel. Co. v. Falcon*,
457 U.S. 147 (1982) ............................................................................ 47

*Genesis Healthcare Corp. v. Symczyk*,
569 U.S. 66 (2013) ...................................................................... 37, 48

*Gladney-Chase v. Collins*,
38 Vet. App. 216 (U.S. 2025) ............................................................ 65

*Hernandez v. County of Monterey*,
305 F.R.D. 132 (N.D. Cal. 2015) ....................................................... 58

*Hicks v. LeBlanc*,
81 F.4th 497 (5th Cir. 2023) ......................................................... 5, 49

*Humphrey v. Leblanc,*
　No. 20-233 (M.D. La.) ...................................................................... *passim*

*Idaho v. Coeur d'Alene Tribe of Idaho,*
　521 U.S. 261 (1997) ...................................................................... 31

*In re Catfish Antitrust Litig.,*
　826 F. Supp. 1019 (N.D. Miss. 1993) ............................................... 57

*In re Deepwater Horizon,*
　739 F.3d 790 (5th Cir. 2014) ........................................................... 54

*In re EDS Securities Litigation,*
　226 F.R.D. 559 (E.D.Tex.2005) ....................................................... 55

*In re Lorazepam & Clorazepate Antitrust Litig.,*
　289 F.3d 98 (D.C. Cir. 2002) ........................................................... 31

*Int'l Truck & Engine Corp. v. Bray,*
　372 F. 3d 717 (5th Cir. 2004) ...................................................... 28, 29

*J.D. v. Azar,*
　925 F.3d 1291 (D.C.Cir. 2019) ................................................ 47, 48, 50

*James v. City of Dallas,*
　254 F.3d 551 (5th Cir. 2001) ........................................................... 64

*Johnson v. Rancho Santiago Cmty. Coll. Dist.,*
　623 F.3d 1011 (9th Cir. 2010) ......................................................... 29

*Kentucky v. Graham,*
　473 U.S. 159 (1985) ....................................................................... 32

*Kermode v. Univ. of Miss. Med. Ctr.,*
　496 F. App'x 483 (5th Cir. 2012) .............................................. 26, 27, 28

x

*Ku v. Tennessee,*
   322 F.3d 431 (6th Cir. 2003)........................................ 25, 26, 28, 29, 30

*Lapides v. Bd. of Regents of Univ. Sys. of Ga,*
   535 U.S. 613 (2002)...................................................................28, 33

*Lightbourn v. Cty. of El Paso,*
   118 F.3d 421 (5th Cir. 1997)................................................ 60, 63, 64

*Manzo-Hernandez v. Saucedo,*
   No. 21-40034, 2021 WL 5627068
   (5th Cir. Nov. 30, 2021) ..................................................... 41, 42, 43

*M.D. v. Perry,*
   675 F.3d 832 (5th Cir. 2012)............................................... 58, 59, 61

*McNeal v. LeBlanc,*
   90 F.4th 425 (5th Cir. 2024) .............................................. 1, 5, 6, 7, 49

*Mullen v. Treasure Chest Casino, LLC,*
   186 F.3d 620 (5th Cir. 1999).......................................................63, 64

*Murray v. Fidelity Nat. Fin., Inc.,*
   594 F.3d 419 (5th Cir. 2010)...........................................................37

*Myers ex rel. Benzing v. Texas,*
   410 F.3d 236 (5th Cir. 2005)...........................................................25

*Neinast v. Texas,*
   217 F.3d 275 (5th Cir. 2000)................................................ 26, 27, 28

*Parker v. LeBlanc,*
   73 F.4th 400 (5th. Cir. 2023) .......................................................5, 49

*Payne v. Travenol Lab'ys, Inc.,*
   673 F.2d 798 (5th Cir. 1982)...........................................................56

*Pennhurst State Sch. & Hosp. v. Halderman,*
  465 U.S. 89 (1984)......................................................................33, 34

*Raj v. Louisiana St. Univ.,*
  714 F.3d 322 (5th Cir. 2013)...........................................................32

*Serrano v. Customs & Border Patrol, U.S. Customs & Border Prot.,*
  975 F.3d 488 (5th Cir. 2020)...........................................................39

*Sonsa v. Iowa,*
  419 U.S. 393 (1975)..........................................................................35

*Stirman v. Exxon Corp.,*
  280 F.3d 554 (5th Cir. 2002).............................................................64

*U.S. Navy SEALs 1-26 v. Biden,*
  72 F.4th 666 (5th Cir. 2023) .......................................................46, 47

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.,*
  669 F.3d 632 (5th Cir. 2012)............................................................23

*Union Pac. R. Co. v. Louisiana Pub. Serv. Comm'n,*
  662 F.3d 336 (5th Cir. 2011)........................................... 25, 26, 27, 28

*United States Parole Commission v. Geraghty,*
  445 U.S. 388 (1980)..................................................... 36, 37, 42,43, 47

*United States v. Hawkins,*
  165 F.4th 442 (6th Cir. 2026) .........................................................54

*Valentine v. Collier,*
  No. 4:20-cv-1115, 2020 WL 3491999
  (S.D. Tex. June 27, 2020).................................................................61

*Walker v. City of Calhoun,*
  No. 15-170, 2016 WL 361580
  (N.D. Ga. Jan. 28, 2016) .................................................................58

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011)................................................................63

*Ward v. Hellerstedt,*
  753 F. App'x 236 (5th Cir. 2018)........................................61

*Yates v. Collier,*
  868 F.3d 354 (5th Cir. 2017)...............................................61

*Zeidman v. J. Ray McDermott & Co.,*
  651 F.2d 1030 (5th Cir. 1981)........................... 38, 39, 43, 48

**Statutes**

La. R.S. § 15:824................................................................6

La. R.S. § 15:1228.10.......................................................15

La. C.Cr.P. art. 892 .....................................................15, 65

**Rules**

Fed. R. Civ. P. 23...........................................................*passim*

**Constitutional Provisions**

La. Const. Ann. art. XII, § 10.............................................34

## INTRODUCTION

Louisiana has been imprisoning people past their legal release dates for decades. The U.S. Department of Justice, after a multi-year investigation, concluded that the Louisiana Department of Public Safety and Corrections ("DPSC") violates the constitutional rights of incarcerated people by detaining them for weeks or months beyond their release dates. Indeed, the DPSC Secretary called the state's system "total chaos." ROA.10713. And, this Court itself has repeatedly condemned Louisiana's overdetention,[1] prompting a judge of this Court to ask aloud during oral argument in an individual overdetention case: "Why didn't someone file a class action?"[2]

Joel Giroir did. He filed his complaint and his class certification motion simultaneously, while he was still sitting in a Louisiana jail past his legal release date. He was released three days later. But the class he seeks to represent, people sentenced to DPSC custody who are overdetained every single month, very much remains.

---

[1] *See* Opening Brief of Appellants (hereinafter "LeBlanc Br.") at 42-43 (collecting cases).

[2] Transcript of Oral Argument at 23:02-23:07, *McNeal v. LeBlanc*, Case No. 22-30180 (5th Cir. Sept. 6, 2023).

1

This Court (and the district court) has authority to enjoin DPSC from violating the Constitution. Our constitutional order reflects a careful balance. States retain broad authority to administer their criminal justice systems, but they do not have license to disregard the Constitution. Since *Ex Parte Young*,[3] settled law has allowed federal courts to stop state officials who violate constitutional rights. That principle is squarely implicated here: for more than a decade, DPSC has known its policies keep people jailed past their release dates, has failed to correct the problem, and now asks this Court to excuse the violation. Federalism has never shielded such unconstitutional conduct.

Sovereign immunity is part of that same constitutional balance, and it too comes with an important limitation: it is a privilege the state may invoke or waive, not a jurisdictional trump card that courts must blindly enforce for the state. Here, DPSC chose waiver. For five years, DPSC chose to litigate this case on the merits—filing motions, conducting discovery, opposing class certification, and participating in an evidentiary hearing.

---

[3] 209 U.S. 123 (1908).

Having lost, DPSC cannot now claim the court lacked the power all along. That is precisely the "heads I win, tails you lose" maneuver that this Court's waiver-by-litigation doctrine prohibits.

In the end, the district court held an evidentiary hearing, considered testimony from DPSC's witnesses, and issued a detailed certification order grounded in fact-finding and well-settled principles under Rule 23. Appellants ask this Court to undo all of that. But to do so, they raise sovereign immunity for the first time, argue mootness based on an erroneous timeline, and ask the Court to prejudge the merits of a case that is being actively litigated. None of these arguments hold up. Thankfully, the Constitution means what it says, and federal courts have the power to enforce it.

The class certification order should be affirmed.

## STATEMENT OF THE ISSUES

1. Whether the Appellants have waived the defense of sovereign immunity when they failed to raise it for five years while actively litigating the merits of the case.

2. Whether Rule 23(f) independently bars Appellants from raising sovereign immunity on interlocutory appeal because it is not an issue of class certification.

3. Whether the case meets an inherent transitory exception to mootness when Giroir's individual claim was mooted while his timely certification motion was pending and class certification was eventually granted.

4. Whether the district court abused its discretion when it certified a class based on well-founded factual determinations made after an evidentiary hearing and application of the correct legal standards.

## STATEMENT OF THE CASE

A claim of overdetention is "now a euphemism for prisoners illegally incarcerated beyond the terms of their sentence." *McNeal v. LeBlanc*, 90 F.4th 425, 428 (5th Cir. 2024) (quoting *Hicks v. LeBlanc*, 81 F.4th 497, 500 (5th Cir. 2023)). Louisiana's systemic overdetention problem is well-documented. This Court has denounced the state time and again for deliberately ignoring systemic administrative failures they knew were leaving prisoners in jail who had already served their sentences.[4] The Louisiana Legislative Auditor ("LLA") has found—twice—that DPSC's inefficient data management, poorly defined procedures, and lack of training and oversight have contributed to a consistent pattern of over-detention. And, after a multi-year investigation into the state's preclassification practices, the U.S. Department of Justice ("DOJ") concluded that DPSC "violates the constitutional rights of people in its custody by detaining them for weeks and often months past their release dates." ROA.12348.

---

[4] *See, e.g., Crittindon v. LeBlanc*, 37 F.4th 177, 187–88 (5th Cir. 2022), *cert. denied*, No. 22-1171, 2023 WL 6377920 (U.S. Oct. 2, 2023) ("A reasonable factfinder could conclude that [LeBlanc's] awareness of this pattern of delays and their conscious decision not to address it rises to the level of deliberate indifference."); *Parker v. LeBlanc*, 73 F.4th 400, 408 (5th. Cir. 2023); *Hicks v. LeBlanc*, 81 F.4th 497, 505 (5th. Cir. 2023).

So systemic are these failures that during oral argument before this Court (in an individual overdetention case), Judge Edith Jones asked, "Well, let me ask: why didn't someone file a class action?" Tr. of Oral Argument at 23:02–23:07, *McNeal v. LeBlanc*, Case No. 22-30180 (5th Cir. Sept. 6, 2023). Indeed, a class action *is* warranted given DPSC's large-scale systemic failure to implement procedures and rules that ensure timely release, resulting in the unlawful imprisonment of thousands of individuals.

## I.    DPSC is Responsible for Every Individual in Its Custody.

To start: DPSC is responsible for every individual in custody from the moment they are sentenced to confinement at hard labor. ROA.10694, ROA.10721; *see also* La. R.S. § 15:824(C)(1). DPSC promulgates Basic Jail Guidelines "to assure that the fundamental constitutional rights" of individuals in DPSC custody "housed in local jails would not be jeopardized." ROA.12379. While delays in release may be due to actors within the local sheriff's offices and clerks of court around the state, ultimately, DPSC is responsible for the timely release of individuals in its custody. *See, e.g.*, ROA.10699.

6

## II.    History of the Overdetention Crisis in Louisiana.

Louisiana's prison population skyrocketed between 1985 and 2010, garnering Louisiana the distinction of having the highest per-capita incarceration rate in the nation. *See* ROA.11134. While the prison population surged, the systems meant to calculate and carry out timely release of individuals sentenced to hard labor could not keep up. By 2012, facing a budget crisis and mounting incarceration numbers, DPSC conducted an internal study of its release procedures, called the "Lean Six Sigma" project. ROA.10701 (testimony of Secretary LeBlanc); *see* ROA.12179–12216 (Lean Six Sigma report). Secretary LeBlanc, a champion of the project, discovered through the project that a significant portion of people in DPSC's custody were being held beyond their legal release dates. ROA.10704; *see McNeal*, 90 F.4th at 429 (noting that the Lean Six Sigma found that "83% of DPSC prisoners [were] being overdetained"). In response to the report, the project set a target of overdetaining no more than 450 people per year. ROA.10709.

This did not occur. Instead, individuals sentenced to DPSC custody continued to be imprisoned well past their legal release dates. In 2016, Secretary LeBlanc highlighted overdetention as an issue in his

7

memorandum to the new administration. ROA.10710. He conducted a series of meetings with Debbie Hudnall, Executive Director of the Clerk of Court's Association, regarding how to speed up the process of time computation. ROA.10711, ROA.8616–17. Ms. Hudnall suggested that the clerks send preclassification documents electronically to DPSC. ROA.10712. The DPSC declined this suggestion. *See* ROA.8646–47 (email from Sec. LeBlanc to Hudnall); ROA.8620–23 (Hudnall deposition).

The next year, in 2017, an LLA report documented DPSC's continued problems calculating and processing release dates. *See* ROA.11136. Despite knowledge of the structural problems with time calculation, five years after the Lean Six Sigma Report, DPSC was still overdetaining on average 200 people per month, for an average of 49 days past their release dates. ROA.11137. This ultimately cost DPSC an additional $2.8 million per year in housing costs alone. ROA.11137. Yet DPSC never fired, demoted, or reprimanded anyone for holding individuals past their release dates. ROA.10706–07.

DPSC itself fully acknowledged the problem. In 2019, DPSC applied for a grant from the DOJ to assist in reducing the number of immediate releases held beyond their release date. ROA.11140. DPSC

8

explained to the DOJ that, despite some progress following the Lean Six Sigma project, "there remains a delay in identifying and processing cases, which leads to . . . an increase in offenders who are due for immediate release based on jail credit and diminution of sentence laws" and "has resulted in negative findings by the Louisiana Legislative Auditor around offender location accountability and time computation processes." ROA.11136. As part of that grant application, DPSC attached a "pull document" from February of 2019, which on its face revealed that 231 individuals were held past their release dates during that single month.[5] *See* ROA.10739.

On its website, DPSC admitted that: "If a person has recently been sentenced to DOC custody, it can take up to 12 weeks to calculate a date as the Department has to receive official paperwork from the sentencing court in order to calculate the offender's release date." ROA.9649. Secretary LeBlanc explained that the intention was to reduce the number of phone calls "inundat[ing]" DPSC with requests for information as to when an incarcerated family member will be released. ROA.9649.

---

[5] Although DPSC later disputed that the document it created was entirely accurate, the fact remains that the vast majority of the individuals identified in this "pull document" were indeed overdetained. *See* ROA.10756, ROA.10890–94.

Secretary LeBlanc acknowledged, however, that "12 weeks is ridiculous. . . . I mean, that's just absurd." ROA.9650.

In October of 2019, the LLA released another report finding DPSC still did not have adequate review processes in place for time computations, ROA.12289, ROA.12282–83, yet the 2019 DPSC Strategic Plan contained nothing about reducing or eliminating the problem of overdetention or ensuring timely and accurate time computation. ROA.10718–19. In fact, it was not until 2023, over a decade after Lean Six Sigma, that DPSC even mentioned the problem in its strategic plan. *See* ROA.10720, ROA.12429.

Similarly, the Basic Jail Guidelines contained no mention of timely computation of time or timely submission of preclassification documents.[6] ROA.10725–26; *see* ROA.11193. It was not until just before the hearing—in this matter on class certification—that Secretary LeBlanc finally added a timeline for sheriffs to provide some documents to DPSC. ROA.10725. As of the time of the hearing, this version of the

---

[6] The Basic Jail Guidelines were implemented as part of a settlement agreement that resolved litigation over DPSC's overcrowding. As part of that settlement agreement, people in DPSC's custody were placed into the physical custody of local sheriff's offices. ROA.10721.

10

Basic Jail Guidelines had not finalized (ROA.10792), and no evidence was offered of any efforts to enforce the timeline.

In the meantime, the U.S. Department of Justice conducted a multi-year investigation and released a report in 2023 finding "a pattern or practice of infringements on the constitutional rights of incarcerated persons." ROA.12348. The DOJ Report concluded that: "**These violations are severe, systemic, and are both caused and perpetuated by serious ongoing deficiencies in [DPSC's] policies and practices.** [DPSC] has persisted with these unconstitutional practices despite at least a decade of notice and clear recommendations for fixing the problem." ROA.12348 (emphasis added). The DOJ Report detailed a litany of specific DPSC policy failures resulting in this systemic overdetention, including failure to adopt policies related to the delivery of sentencing paperwork for individuals housed in parish jails and failure to adopt adequate time computation processes. ROA.12357–67.

As a result of the DOJ Report, DPSC began to implement changes to its time calculation system, including beginning to change data management systems from CAJUN to CIPRS, adding a portal for electronic submission of preclassification documents, and a module for

automatic time calculation. *See* ROA.10833. Within months of the DOJ Report, five parishes were using an electronic document submission portal. ROA.10834. But while DPSC witness Bickham testified that he expected to "have all 64 parishes up" on the electronic portal within the next year, ROA.10854, at the time of the evidentiary hearing only five parishes were using the portal. ROA.10834. And in the district court, ongoing discovery reveals that individuals continue to be overdetained every month.

## III. "Total Chaos": How DPSC Calculates Time.

DPSC's systemic problems have created a predictable problem on the ground in Louisiana: "just total chaos." As Secretary LeBlanc explained at the class certification hearing:

> [E]very district is on a different system, if they even have it. Every clerk of court is on a different system, if they have it. And **it's just total chaos** in regards to trying to get everybody on the same page in that regard.

ROA.10713 (LeBlanc) (emphasis added).

DPSC's Preclassification Department ("preclass") is responsible for collecting, maintaining, and managing information and records regarding individuals in its custody, specifically calculating time an individual must serve once sentenced, and ensuring timely release.

ROA.10680. Preclass staff are physically located in three places around the state: at DPSC Headquarters in Baton Rouge, at Raymond Laborde in Cottonport, and at David Wade in Homer. ROA.10855, ROA.12352. Preclass uses a set of documents it obtains from the clerk of court from the district of sentencing, and the local jail where the person was housed, in order to calculate a release date. ROA.10680–81. Specifically, the clerk of court sends a uniform commitment order to the sheriff of the parish where the person is housed. ROA.10682. The sheriff then compiles that document with additional records. ROA.10683. This information is compiled in what is called a "preclass packet." ROA.10681.

**No uniform statewide procedure or rule governs when or how the preclass packet is delivered to DPSC**. ROA.10684. Some preclass packets are delayed or incomplete when they arrive at DPSC. ROA.10686. Some are sent "piecemeal." ROA.10766. DPSC does not have a policy that governs how to identify and prioritize individuals who would be entitled to immediate release upon sentencing. ROA.10687. At the time of the evidentiary hearing on class certification, DPSC used a system called CAJUN to process time calculations and release dates. ROA.10688.

**There is often delay in calculating time after the preclass packet is complete.** *See* ROA.11772. The time computation process generally involves manually inputting a combination of sentencing information into CAJUN, determining the applicable statute related to good time credits, and calculating the individual's parole eligibility and offender class. ROA.10689. As presented at the evidentiary hearing on class certification, DPSC's "guide" for how to use CAJUN to calculate time was simply a list of hand-written notes. ROA.10752–53, ROA.11266–72.

**Even after time is calculated, DPSC resorts to ad-hoc phone calls and emails to ensure information is complete.** ROA.10804–05. After identifying a release date, preclass still must contact the courts and district attorneys for any arrests lacking dispositions, verify DNA is on file with state police, and check victim-notification requirements. ROA.10691. Preclass then must issue a release certificate and send it to the housing facility. ROA.10691. Only then is the individual released from DPSC custody.

**Electronic document submission: too little, too late.** The DOJ's scathing report recommended that DPSC implement an electronic

14

document submission system so local clerks and sheriffs could submit documents electronically to DPSC. ROA.10848 (Testimony of DPSC Undersecretary Thomas Bickham); ROA.12367–68 (DOJ Report). After the DOJ issued its report, DPSC decided to expedite developing an electronic submission portal. It took DPSC only 3.5 months, from March to July 2023, to develop a standalone electronic submission portal. ROA.10849–50. The current electronic submission system allows clerks and sheriffs to transfer pre-class documents electronically. ROA.10834. Still, no mandate for electronic submission currently exists.[7] *See* La. R.S. § 15:1228.10 ("each agency shall retain discretion regarding the method of transmission for its data submissions.").

## IV.    Joel Giroir Was Illegally Incarcerated for 27 Days in DPSC Custody.

Giroir was originally sentenced to one year at hard labor on January 26, 2021. ROA.9002. He was entitled to immediate release upon sentencing. ROA.9005 (showing negative "must serve" days). At the time of sentencing, he was housed at the St. Tammany Parish Jail. Due to a

---

[7] Appellants' claim in their Brief that La. C.Cr.P. art. 892 mandates electronic submission is undercut by La. R.S. § 15:1228.10(C), which allows agencies leeway in determining the method of submission. *See* LeBlanc Br. at 27.

total lack of procedures, timelines, deadlines, or rules from DPSC governing how and when the local sheriff transmits preclass documents, Giroir was overdetained for seventeen days before his preclass packet was emailed to the preclass department at Raymond Laborde on February 12, 2021. ROA.8980.

A preclass employee eventually reviewed the documents and discovered a discrepancy with Giroir's Arrest Tracking Numbers on his fingerprint rap sheet and criminal history. ROA.8981. The staff member made telephone calls to St. Tammany Parish Jail that day to resolve the issue, but it remained unresolved. ROA.8981. Another two days passed with Giroir still incarcerated despite the fact that he was entitled to release. Then, on February 15, the preclass department at Laborde closed for a full week,[8] during which no preclass staff were working on Giroir's time calculation. ROA.8981. The last day of the office closure was February 19, 2021. ROA.10785. Two more days passed. ROA.8981. Finally, on February 22, 2021, preclass staff returned to the office and

---

[8] Appellee acknowledges that a weather-related office closure was an alleged cause of further overdetention, but as the district court noted, Giroir had already been substantially overdetained by the time the storm caused any office closures, and it is "very reasonable" to argue that "the ice storm would have played no role but for LeBlanc's unconstitutional policies." ROA.10601.

16

found the complete preclass documents waiting. ROA.8981. Mr. Giroir was released later that day. ROA.9036.

## V.    Procedural History.

### A.    The Complaint and Motion for Class Certification.

On February 19, 2021, while still incarcerated in St. Tammany Parish, Giroir filed a putative class action complaint and a motion for class certification. ROA.8410–8781. He was released three days later. ROA.8981. On April 9, 2021, the Appellants filed a Rule 12(b)(6) Motion to Dismiss, asserting: (1) failure to state a claim for prospective relief regarding past harm due to claims being moot, ROA.8843–45; (2) lack of specificity in identifying which actions are to be enjoined, ROA.8845–47; and (3) prescription as to any claims arising before February 19, 2020, ROA. 8847–48. The district court held a status conference on April 19, 2021, at which the parties agreed to consolidate discovery with a related case, *Humphrey v. LeBlanc*.[9] At that status conference, the district court extended the Appellants' time to respond to the class certification motion and administratively denied the class certification without prejudice

---

[9] Brian Humphrey and Bryant White also filed a putative class action complaint in April 2020, *Humphrey v. Leblanc*, No. 20-233 (M.D. La.), seeking damages for past overdetention.

pending discovery. ROA.8852–53. Appellee renewed an identical motion for class certification on September 10, 2021. ROA.8873.

Appellants responded to the Motion for Class Certification on October 1, 2021, disclaiming responsibility for 17 of the 27 days that Mr. Giroir was overdetained, ROA.8949–50, denying responsibility for problems with the time computation procedure generally, ROA.8962, and claiming that it has worked on correcting the systemic issues. ROA.8954–55. Again, Appellants claimed that Appellee had failed to identify a specific policy at issue or an overall fix for the problem. ROA.8960–61, ROA.8971.

At no time before the district court, however, did Appellants ever raise sovereign immunity. *See* ROA.8839, ROA.8948. Nor did Appellants assert that Giroir was an inadequate class representative due to his release from custody. *Id.*

The district court denied the motion dismiss, ROA.9601, and Giroir amended his complaint to define the class as "all persons who were sentenced to [DPSC custody] on or since February 17, 2020, . . ." ROA.9615. Appellants filed an answer on June 15, 2022, but did not raise sovereign immunity or mootness. *See* ROA.9820–37.

At another status conference on June 30, 2022, the district court again administratively denied the class certification motion without prejudice—and this time, stayed and administratively closed the case pending settlement negotiations. ROA.9842. Once it became clear that the matter would not be resolved, the court reopened the matter and reinstated all motions. ROA.10117.

## B.   Evidentiary Hearing on Class Certification.

On October 19, 2023, the district court held an evidentiary hearing on class certification. ROA.10208. During the hearing, the district court heard from five DPSC witnesses and considered sixteen exhibits. ROA.10889. DPSC witnesses detailed their preclass and release procedures, *see, e.g.*, ROA.10678–93 and ROA.10764–90 (Program Manager Angela Griffin); and the way DPSC's record and time calculation technology operates, ROA.10726–64 (Director of Data Research Melanie Gueho). The district court also heard evidence of DPSC's institutional awareness of the overdetention problem, dating at least back to the Lean Six Sigma Report in 2012. ROA.10693–10725 (Secretary James LeBlanc).

The district court also heard evidence that the DPSC used its own data to identify 1,700 people in their custody eligible for immediate release between April 2019 and May 2020. ROA.10733. To compile this data, Melanie Gueho created a "pull document" spreadsheet that includes a "must serve" number indicating the days remaining on a person's sentence. ROA.10729–32, ROA.10736. A person with a negative "must serve" number is eligible for immediate release. ROA.10732. The district court heard testimony that DPSC preclass staff can verify the data. ROA.10762, ROA.10771–79.

At the close of the evidence, the district court noted that DPSC's time computation and release procedures appeared to be

> . . . . **Byzantine just sort of archaic, medieval deal where I can see somebody on a horse going from the clerk's office over to the sheriff's office and then the sheriff's office down to Baton Rouge**.
>
> . . . it seems to me, in terms of the predominance, you've got - - the predominance of the issues is not the individual specific details of why somebody got out in five days and somebody else got out in 15 days. It is what was the problem that was causing both the 5-day guy and the 15-day guy to get out late.

ROA.10875 (emphasis added).

Appellants filed a post-hearing brief on November 30, 2023, asserting generally that individual issues predominate and its pull

documents were insufficient to establish the class. ROA.10226–35. Appellants did not raise sovereign immunity, or inadequacy of Mr. Giroir as a class representative. *Id.*

## C.   District Court Certifies the Class.

On September 22, 2025, the district court issued a ruling granting class certification. ROA.10535. In its ruling, the district court made detailed factual findings regarding DPSC's time calculation and release process. ROA.10535–76. Then, after considering all the evidence and testimony before it, the district court found the Rule 23(f) factors satisfied. ROA.10582–10649.

Appellants petitioned this Court for permission to appeal the class certification decision on October 6, 2025, and this Court, in a split decision, granted leave to appeal on November 5, 2025.

## SUMMARY OF ARGUMENT

Appellants raise four challenges to the district court's class certification order—but each one fails.

*First,* DPSC waived sovereign immunity by litigating this case for five years without invoking it. A state cannot monitor how litigation proceeds, lose on the merits, and then claim immunity. Beyond waiver,

Rule 23(f) independently bars DPSC from raising sovereign immunity on interlocutory appeal, and in any event, *Ex Parte Young* permits identical injunctive relief against the Secretary in his official capacity regardless of whether DPSC remains a named defendant.

*Second*, the Secretary waived his sovereign immunity over the state-law claims for the same reasons DPSC waived its immunity. And even setting waiver aside, the district court may grant the same declaratory and injunctive relief under federal law alone.

*Third*, this case is not moot. Giroir filed his complaint and his class certification motion while he was still incarcerated. His individual claim became moot less than three days later—while his certification motion was pending. Under *County of Riverside v. McLaughlin*, that is all that is required. Appellants' four attempts to avoid this conclusion all fail. Their timeline is factually wrong. Their "changed circumstances" argument is a merits defense dressed up as a mootness argument, which Rule 23 does not permit at the certification stage. Their "not inherently transitory" argument ignores that Giroir's claim lasted exactly two days over a weekend after he moved for certification—a period within which no district court could reasonably be expected to resolve a certification

motion. And their *Lyons* argument based on the *Humphrey* damages class was squarely rejected by the Supreme Court in *McLaughlin* itself.

*Fourth*, the district court did not abuse its discretion in applying Rule 23. Appellants waived their adequacy objection, and any alleged conflict between the *Giroir* injunctive class and the *Humphrey* damages class is entirely speculative. The class also satisfies Rule 23(b)(2), commonality, and typicality because every class member's claim flows from the same DPSC policies and systemic failures that DPSC has known about for over a decade. This Court should affirm the certification order.

## STANDARD OF REVIEW

Rule 23(f) permits a party to "appeal only the issue of class certification; no other issues may be raised." *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 314 (5th Cir. 2005) (cleaned up). This Court must uphold the district court's decision on class certification unless there has been "an abuse of discretion." *Cleven v. Mid-America Apartment Cmtys., Inc.*, 20 F.4th 171, 176 (5th Cir. 2021) (internal citation omitted). "An abuse of discretion occurs only when all reasonable persons would reject the view of the district court." *Id.* (quoting *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 638 (5th Cir. 2012)). While the district

court must conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class, "[t]he decision to certify is within the broad discretion of the court" as long as "that discretion [is] exercised within the framework of rule 23." *Cleven*, 20 F.4th at 176 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996)).

## ARGUMENT

### I.    Sovereign Immunity Does Not Apply to DPSC.

DPSC has been actively litigating this lawsuit for over five years. In all that time, DPSC never raised sovereign immunity as a defense to Giroir's claim for injunctive relief. Not in its motion to dismiss. ROA.8839. Not in its answer. ROA.9820. And not in its opposition to class certification or any of the multiple pleadings it filed addressing the issue of class certification. *See, e.g.,* ROA.8948, ROA.9772, ROA.9838, ROA.9932, ROA.10226.

But now, for the first time, DPSC says it has sovereign immunity and should be dismissed from the lawsuit. LeBlanc Br. 30–31. According to DPSC, application of this immunity is straightforward: Since "DPSC is an agency of Louisiana," it is "immune from suit and should be dismissed as a party." LeBlanc Br. 30 (citing *Champagne v. Jefferson*

*Parish Sheriff's Office*, 188 F.3d 312, 313–14 (5th Cir. 1999)). From a 20,000-foot view, that may be half right. DPSC *is* an agency of Louisiana. And state agencies *can* be immune from federal lawsuits. But contrary to DPSC's terse, one-page argument, the Court's sovereign immunity analysis does not end just because DPSC is a state agency in federal court.

## A.   DPSC Waived Sovereign Immunity.

For nearly 150 years, the Supreme Court has "long recognized that a State's sovereign immunity is 'a personal privilege which it may waive at pleasure.'" *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) (quoting *Clark v. Barnard*, 108 U.S. 436, 447 (1883)). As such, sovereign immunity is neither automatic nor absolute. *Union Pac. R. Co. v. Louisiana Pub. Serv. Comm'n*, 662 F.3d 336, 340 (5th Cir. 2011). Instead, like an affirmative defense, a state agency can choose to either raise sovereign immunity or waive it altogether. *Id.* (collecting cases). For instance, "a state may waive its immunity by voluntarily consenting to suit." *Id.* (citing *Coll. Sav. Bank*, 527 U.S. at 675–76); *Myers ex rel. Benzing v. Texas*, 410 F.3d 236, 241 (5th Cir. 2005).

25

In this way, sovereign immunity is far afield from pure jurisdictional issues that can never be waived, such as Article III standing or subject matter jurisdiction. *See Ku v. Tennessee*, 322 F.3d 431, 434–35 (6th Cir. 2003) (explaining how the Supreme Court "has unequivocally rejected the view" that sovereign immunity "should be treated [like] 'subject matter' jurisdiction"); *accord Union Pac. R. Co.*, 662 F.3d at 340. For true "jurisdictional" issues, *c.f.* LeBlanc Br. 30–31, the Court has an independent "duty to determine whether standing [or subject matter jurisdiction] exists even if not raised by the parties." *Bertulli v. Indep. Ass'n of Continental Pilots*, 242 F.3d 290, 294 (5th Cir. 2001).

Contrast with sovereign immunity, where the state must affirmatively raise it or the issue is waived. When, like here, the state first raises the issue on appeal, "the court must consider whether a state's failure to raise the issue below effectively waived its claim to immunity." *Kermode v. Univ. of Miss. Med. Ctr.*, 496 F. App'x 483, 489 (5th Cir. 2012) (quoting *Neinast v. Texas*, 217 F.3d 275, 279 (5th Cir. 2000) (cleaned up)). If the state waived its sovereign immunity in the district court, then it cannot "avail itself of the defense" on appeal. *Ku*, 322 F.3d at 435, *accord*

26

*Neinast*, 217 F.3d at 279. That's a much different inquiry than true jurisdictional issues, like subject-matter jurisdiction or Article III standing, which the Court can both raise and resolve *sua sponte* on appeal.

To determine whether a state waived its sovereign immunity, the Court must evaluate "whether the state's litigation conduct constituted a voluntary invocation of federal jurisdiction." *Union Pac. R. Co.*, 662 F.3d at 341. A classic example of invoking federal jurisdiction is when the state removes a case from state to federal court—expressly asking the federal court to resolve the case. *See Benzing*, 410 F.3d at 243–48. A state can also file affirmative claims of its own in federal court, which, of course, asks the federal court to resolve the case. *Neinast*, 217 F.3d at 279. Or, a state can decide to defend against a lawsuit that was filed in federal court "on the merits"—likewise asking the federal court to resolve the case. *Id.* In all three situations, the state waives sovereign immunity.

For the third option, the state does not need to expressly renounce its sovereign immunity when it decides to litigate the case on the merits. Rather, as this Court explained, "a state's delay in raising the defense of sovereign immunity at the trial level may constitute waiver if it evidences

27

an intent to defend the case on the merits." *Kermode*, 496 F. App'x at 489 (citing *Neinast*, 217 F.3d at 279). When deciding whether to raise immunity or litigate a case, this Court warned: "the state cannot simultaneously proceed past the motion and answer stage to the merits and hold back an immunity defense." *Neinast*, 217 F.3d at 279. When it does, the state waives sovereign immunity by litigating the case. *See, e.g.*, *Int'l Truck & Engine Corp. v. Bray*, 372 F. 3d 717, 720 n.4 (5th Cir. 2004).

This "waiver-by-litigation" rule makes perfect sense: "without it, a state entity might have an unfair advantage if it could wait until the eve of trial to assert its immunity." *Kermode*, 496 F. App'x at 489. As the Sixth Circuit put it, a state should not be permitted to "engage[] in extensive discovery," "invite[] the district court to enter judgment on the merits," and then, only after it loses, "reveal[ ] that it had its fingers crossed behind its metaphorical back the whole time." *Ku*, 322 F.3d at 435 (relying on *Lapides v. Bd. of Regents of Univ. Sys. of Ga*, 535 U.S. 613, 622–23 (2002)). As such, the "common thread" among all waiver cases is a flat rejection of DPSC's attempt to monitor how the suit is proceeding on the merits but have any adverse ruling set aside on

28

Eleventh Amendment grounds." [10] *Neinast*, 217 F.3d at 279; *see also Benzing*, 410 F.3d at 248 (collecting cases) (explaining that a state, "when faced with a federal claim," cannot voluntarily invoke jurisdiction and then "escape the result of its own voluntary act by invoking [sovereign immunity]"). Sovereign immunity is not a "heads I win, tails you lose" escape hatch for states that regret their choice to litigate in federal court.

But that is exactly how DPSC wants to use sovereign immunity here. DPSC never raised sovereign immunity as an affirmative defense to Giroir's injunctive claims. ROA.9822. Instead, it litigated the case for five years and invoked immunity only after losing class certification. *See supra* pp. 13–16 (detailing the procedural history). This Court and others have held that such conduct waives immunity— "appearing without objection and defending on the merits in a case over which the district court otherwise has original jurisdiction." *Ku*, 322 F.3d at 435; *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1022 (9th Cir. 2010)

---

[10] When this Court has found no waiver despite the state choosing the litigate the case in federal court, it is typically because the state was either "successful in the district court and [was] not attempting to use immunity to void an unfavorable judgment," *see Union Pac. R. Co.*, 662 F.3d at 341, or because the case did not proceed far enough on the actual merits, *see Neinast*, 217 F.3d at 279–80. Neither situation applies here. *See supra* pp. 13–16.

(same); *Int'l Truck & Engine Corp.*, 372 F.3d at 720 n.4 (same); *Bd. Of Regents of Univ. Of Wisconsin Sys. v. Phoenix Int'l Software, Inc.*, 653 F.3d 448, 458–77 (7th Cir. 2011) (collecting cases and history). As such, DPSC's decision below to litigate this case "*is* a form of voluntary invocation of the federal court's jurisdiction" that waived sovereign immunity. *See Ku*, 322 F.3d at 435 (emphasis added). DPSC cannot now reverse course simply because it lost.

## B.    DPSC Cannot Raise Sovereign Immunity Under Rule 23(f).

Rule 23(f) "bridle[s]" the Court's review of a class certification order. *Bell v. Ascendant Sols., Inc.*, 422 F.3d 307, 314 (5th Cir. 2005). Under Rule 23(f), "a party may appeal only the issue of class certification; no other issues may be raised." *Bertulli*, 242 F.3d at 294; *see also, e.g.*, *Bell*, 422 F.3d at 314 (refusing to consider the exclusion of an expert report). Thus, DPSC cannot raise the issue of sovereign immunity, which was not before the district court and is not related to the merits of class certification. DPSC concedes as much in its brief. *See* LeBlanc Br. 30–31. As such, this Court lacks jurisdiction to address the issue under Rule 23(f). *See Fox v. Saginaw Cnty., Michigan*, 67 F.4th 284, 292 (6th Cir.

30

2023) (explaining that it had jurisdiction to review only an issue that was actually addressed in the class certification order).

The lone exception to Rule 23(f)'s scope is true jurisdictional issues, like Article III standing or subject-matter jurisdiction, which the Court always has an independent duty to evaluate at every stage in a case. *See Bertulli*, 242 F.3d at 294. But, as detailed *supra* pp. 21–25, sovereign immunity is not in the same jurisdictional bucket as standing or subject-matter jurisdiction because a state agency can waive immunity. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997) (rejecting the interpretation that the Eleventh Amendment is "a nonwaivable limit of the Federal Judiciary's subject-matter jurisdiction"). And so, when the state attempts to raise an issue–like sovereign immunity–that impacts neither "constitutional standing" or the "issue of class certification," Rule 23(f) bars appellate review. *In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 107–08 (D.C. Cir. 2002), *accord*, *Bell*, 422 F.3d at 314; *Earl v. Boeing Co.*, 53 F.4th 897, 901 (5th Cir. 2022).

DPSC cites no contrary case or support saying otherwise. Instead, DPSC cites only to *Bertulli*, which was about Article III standing—not immunity—and does not compel a different result. *See* LeBlanc Br. 30–

31

31. Thus, even if DPSC did not waive sovereign immunity, the proper place to raise immunity is back with the district court—not on interlocutory appeal under Rule 23(f).

### C.   DPSC's Sovereign Immunity Does Not Impact Class Certification or the Underlying Merits of the Case.

Even if, *arguendo*, DPSC did *not* waive its sovereign immunity *and* the Court could review DPSC's immunity under Rule 23(f), nothing would change about the case or the class certification order.

Sovereign immunity "does not bar suits for injunctive or declaratory relief against individual state officials acting in violation of federal law." *Raj v. Louisiana St. Univ.*, 714 F.3d 322, 328 (5th Cir. 2013) (citing *Ex Parte Young*, 209 U.S. 123, 155–56 (1908)). To invoke the *Ex Parte Young* exception, "a plaintiff must name individual state officials as defendants in their official capacities," and ask for "injunction or declaratory" relief "grounded on federal law." *Id.* (citing *Kentucky v. Graham*, 473 U.S. 159, 169 n.18 (1985)).

Here, Giroir checked both boxes: (1) he named the Secretary of DPSC in his official capacity as a defendant, and (2) he asked only for declaratory and injunctive relief. *See* ROA.10538–39, ROA.8410. Specifically, he asked the district court to order Appellants "to end the

32

practice of overdetention beyond forty-eight hours due to [their] unconstitutional policies." ROA.10648. Under *Ex Parte Young*, the district court can order that relief regardless of whether DPSC remains a named defendant. Appellants do not suggest otherwise. As such, a finding that DPSC is immune from suit would not impact class certification. Appellants' lead argument is both incorrect and ultimately meaningless.

## II.  The District Court Properly Certified the State-Law Claims.

Appellants' second argument is also wrong and pointless for the same reasons. The Secretary argues that Giroir's state law claims must be dismissed because he has sovereign immunity for these claims. LeBlanc Br. 31. And, unlike Giroir's due process claim, the Secretary says he "cannot be sued for violations of state law in federal court, even under the *Ex Parte Young* exception." *Id.* at 31–32 (quoting *Corn v. Mississippi Dep't of Pub. Safety*, 954 F.3d 268, 275 (5th Cir. 2020), and citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984)).

The Secretary can, however, waive his sovereign immunity over state-law claims in the same way DPSC waived its sovereign immunity. *See Lapides*, 535 U.S. at 617–18. Indeed, in *Lapides*, the Supreme Court

expressly found waiver of state-law claims. *Id.* at 624. And in both *Corn* and *Pennhurst*, the courts evaluated whether the state waived sovereign immunity. *See Corn*, 954 F.3d at 275; *Pennhurst*, 465 U.S. at 99. As such, the Secretary waived his sovereign immunity over the state-law claims.

Regardless, even if the Secretary did *not* waive his sovereign immunity over the state-law claims, the district court can still grant the same relief under Giroir's federal law claims. In fact, the *Giroir* class asks for identical declaratory and injunctive relief "under the United States Constitution as well as the state law rights of the class." ROA.10647. In other words, the state law claims are just "belts and suspenders" for the federal claim. So whether under state or federal law or both, the result is the same: The district court can enjoin Appellants from continuing to allow individuals to be incarcerated past their legal release dates.[11] *See* ROA.10647–48.

As with Appellants' lead argument, this argument is incorrect and immaterial to the outcome.[12]

---

[11] Importantly, even if the Secretary is correct and the state law claims should be dismissed from this federal lawsuit, the class could still bring these claims in Louisiana state court. *See* La. Const. Ann. art. XII, § 10 (waiving sovereign immunity in state court for torts).

[12] As such, even if the Court is inclined to apply immunity to both DPSC and the state-law claims, the Court can still otherwise affirm the certification order and

## III.    The Giroir Class is Not Moot.

Appellants next argue that the district court erred in certifying the class because Giroir's individual claims were moot before the class was certified in September 2025. LeBlanc Br. 34–46. This argument also fails. To start, Appellants do not dispute that, when Giroir filed his original complaint and motion for class certification, he was in DPSC custody and being allegedly overdetained. *See* LeBlanc Br. 21–22. As such, Giroir unquestionably had standing when he filed his certification motion on February 19, 2021. ROA.8410, 8575. Giroir was released on February 22, 2021. ROA.10646. This is when his individual claims became moot.

To be sure, if Giroir had "sued only on [his] own behalf," this case would be moot and require dismissal. *See Sonsa v. Iowa*, 419 U.S. 393, 399 (1975). But Giroir brought this suit as a class action. And for class actions, a case does not automatically become moot "even though the claim of the named plaintiff has become moot." *Fontenot v. McCraw*, 777 F.3d 741, 749 (5th Cir. 2015) (quoting *Sonsa*, 419 U.S. at 402). Rather, the Supreme Court recognizes several scenarios where a class action is

---

remand with instructions to dismiss DPSC and the state-law claims. Nothing else would need to change.

*not* mooted when the named plaintiff's individual claim becomes moot. These scenarios largely depend on the timing and interplay between (a) the motion for class certification, (b) when the named plaintiff's claim became moot, and (c) when the district court granted or denied class certification.

Starting with *Sosna*,[13] the Supreme Court recognized that a class action is not moot when "the named class action plaintiff's claim becomes moot *after* the class was certified." *Fontenot*, 777 F.3d at 748 (citing *Sosna*, 419 U.S. at 393, 402–03). In this situation, the named plaintiff files his certification motion—and the district court grants that motion—before the individual claim becomes moot. Next is *United States Parole Commission v. Geraghty*, 445 U.S. 388 (1980). In *Geraghty*, the Court recognized that a class is not moot when the named plaintiff's claim became moot *after* class certification was denied but *before* an appeal reverses that decision. *Fontenot*, 777 F.3d at 749. *Geraghty* essentially keeps the class alive if the individual claim becomes moot while an appeal is pending. 445 U.S. at 404. Of course, if the appeal affirms denial of the

---

[13] While some of these exceptions do not apply to Giroir, they are still worth mentioning to clarify Appellants' confusion about the distinct scenarios and whether they apply in this case. *See* LeBlanc Br. 33–37.

36

certification order, the case is over. But if the appeal reverses and certifies the class, the class is not moot despite the fact that the named plaintiff's claim became moot on appeal. *Id.*

Together, *Sosna* and *Geraghty* keep a class action alive so long as the district court rules on class certification *before* the named plaintiff's claim becomes moot:

*Sosna*:      Motion → Class Granted → Named Plaintiff Mooted
*Geraghty*:  Motion → Class Denied → Named Plaintiff Mooted → Appeal

Finally, the Supreme Court in *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) recognized that some claims are so "inherently transitory that the trial court will not have enough time to rule on a motion for class certification before the [named plaintiff's claim]" becomes moot. 500 U.S. at 51–52. This is also known as the "'capable of repetition, yet evading review' exception to the mootness doctrine." *Murray v. Fidelity Nat. Fin., Inc.*, 594 F.3d 419, 421 (5th Cir. 2010). In this situation, the class action does not become moot even though "the class was not certified until after the named plaintiff's claims had become moot." *McLaughlin*, 500 U.S. at 52; *see also Fontenot*, 777 F.3d at 750 (analyzing *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75–76

(2013)). This scenario applies when a certification motion "[has] been diligently filed and pursued at the time the named plaintiff's claim becomes moot," *Fontenot*, 777 F.3d at 751 (citing *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1050–51 (5th Cir. 1981)), even though the district court had not yet granted the motion:

*McLaughlin*: Motion → Named Plaintiff Mooted → Class Eventually Granted

Giroir filed his certification motion on February 19, 2021, it was mooted when he was released from custody on February 22, 2021, *see supra* pp. 11–12, and the district court later certified the class. Under *McLaughlin* then, Giroir's "class certification motion[ ] [had] been diligently filed and pursued at the time [his] claim [became] moot"—*i.e.*, on February 22, 2021. *See Fontenot*, 777 F.3d at 751. What matters for *McLaughlin* is that a certification motion was filed and pending when Giroir's claims became moot. Giroir checks that box. Thus, when the district court later granted certification, the class claims were <u>not</u> moot despite Giroir's individual claim becoming moot while his class certification motion was pending.

This result follows the Supreme Court's reasoning. In *Sosna*, the Court envisioned "cases in which the controversy involving the named

plaintiffs is such that it becomes moot as to them before the district court can reasonably be expected to rule on a certification motion." *Sosna*, 419 U.S. at 402 n.11; *see also Zeidman*, 651 F.2d at 1045. That is what happened here. Giroir filed his certification motion on a Friday, and his claims became moot by Monday—well before any ruling could be expected and nearly three weeks before Appellants' response was even due. *See* ROA.8388 (Docket Entry 4).

Then, in *Gerstein v. Pugh*, the Supreme Court explained that "the termination of a class representative's claim does not moot the claims of the unnamed members of the class" when, just like here, "it is certain that other persons similarly situated will be detained under the allegedly unconstitutional procedures," essentially creating the "constant existence of a class of persons suffering the deprivation," 420 U.S. 103, 110 n.11 (1975); *see also Serrano v. Customs & Border Patrol, U.S. Customs & Border Prot.*, 975 F.3d 488, 492 n.1 (5th Cir. 2020). That is exactly what the district court recognized when granting this class certification, s*ee* ROA.10648, and it remains true today: Appellants are still overdetaining individuals in the same way they overdetained Giroir.

39

*See infra* pp. 56–60. Giroir's individual mootness does not change that reality. Under *McLaughlin*, this class action is not moot.

To avoid this result, Appellants raise essentially four arguments. *First*, Appellants say that because Giroir's claim was moot at the time his renewed certification motion was filed, no exception applies. LeBlanc Br. 34–35. *Second*, Appellants claim that "changed circumstances" mooted the case—meaning that, on the merits, Appellants have allegedly "fixed" the overdetention problem. *Id.* at 38–39. *Third*, Appellants argue that, despite mooting Giroir's case in less than 72 hours, they overdetain people long enough for the district court to certify a class, so the "inherent transitory" exception from *McLaughlin* does not apply. *Id.* at 40, 42–45. And *fourth*, Appellants say that the *Humphrey* certified class, which asks for damages, moots the *Giroir* class that is asking for injunctive relief. *Id.* at 40–41.

Appellants, however, are wrong on all four fronts. None of these arguments compel a finding of mootness in this case.

## A. Giroir's Motion for Class Certification was Pending When his Claim Became Moot.

Appellants argue at length that no mootness exception applies because (i) Giroir's individual claim was already moot when he refiled his

certification motion, and (ii) Giroir did not appeal the district court's April 2021 order denying certification without prejudice. These arguments rest on a basic conflation of distinct mootness exceptions and factual errors on the timing of Giroir's motion, when his individual claims became moot, and what the initial "denial" actually was.

Start with the timing. Appellants repeatedly suggest that Giroir's individual claims became moot *after* the district court's order in April 2021 but *before* he renewed his certification motion. *See* LeBlanc Br. 23. But Giroir's individual claim had become moot almost two months earlier. In other words, Giroir's motion for class certification motion was pending when his claim became moot.

Appellants need this (wrong) timeline to liken this case to the Court's unpublished *per curium* decision in *Manzo-Hernandez v. Saucedo*, No. 21-40034, 2021 WL 5627068 (5th Cir. Nov. 30, 2021). *See* LeBlanc Br. 36–37. In *Manzo-Hernandez*, the district court denied a certification motion when the named plaintiffs' claims were not moot. 2021 WL 5627068, at *2. The plaintiffs filed a motion to reconsider the denial of class certification, which was also denied. *Id.* After that, all but one of the named plaintiffs' claims became moot. The government then filed a

41

motion to dismiss, which the district court granted and dismissed the remaining named plaintiff's claim. *Id.* And while the plaintiffs appealed the district court's order dismissing their case," they did *not* appeal "the denial of class certification or the motion for reconsideration." *Id.* This Court found the appeal moot "because Petitioners did not appeal either order related to their class-certification motion." *Id.* at *4.

This Court's decision in *Manzo-Hernandez* aligns with the Supreme Court's reasoning in *Geraghty*, where the named plaintiff's claims became moot *after* class certification was denied but *before* a successful appeal of that issue. *See* 445 U.S. at 404. If the appeal reverses and certifies the class, the case can continue. But in *Manzo-Hernandez*, the plaintiffs failed to appeal the denial of class certification or the motion for reconsideration, thus depriving this Court of jurisdiction to consider it. 2021 WL 5627068, at *4. As such, the *Geraghty* exception to mootness could not apply. *See Bowles v. Russell*, 551 U.S. 205, 209–11 (2007).

Moreover, unlike Giroir, Manzo-Hernandez could not use the *McLaughlin* exception to mootness for at least two reasons: There was no pending motion *when the claims became moot*, and the district court denied (rather than granted) class certification:

42

> *Geraghty*:   Motion → Class Denied → Named Plaintiff Mooted → Appeal
> *Manzo*: Motion → Class Denied → Name Plaintiff Mooted → No appeal
>
> *McLaughlin*:  Motion → Named Plaintiff Mooted → Class Eventually Granted
> *Giroir*: Motion → Named Plaintiff Mooted → Class Eventually Granted

As the Supreme Court's cases make clear, the timing and interplay between these events are often dispositive. Although *Manzo-Hernandez* failed to properly follow *Geraghty*, Giroir successfully followed *McLaughlin*.

In *Fontenot*, this Court emphasized that this timing and sequencing matters. 777 F.3d at 751. The Court explained that its own opinion in *Zeidman*, which tracks the *McLaughlin* exception, "is predicated on a class certification motion's having been diligently filed and pursued at the time the named plaintiff's claim becomes moot." *Id*. Giroir's class certification motion was pending when his claims became moot. This fact collapses Appellants' entire argument about timing and a missing appeal.

The correct timing exposes the flaws in Appellants' mootness argument and their misplaced comparison to *Manzo-Hernandez*. Appellants claim Giroir did not appeal the denial of his original certification motion and thus had no pending motion to relate back to when his claim became moot. LeBlanc Br. 37. That is wrong. When

43

Giroir's claim became moot, his timely motion *was still pending*, and the later decision to certify the class properly related back under *McLaughlin*. Plus, Giroir's refiled motion was nearly identical to the original. *Compare* ROA.8577–93 *with* ROA.8873–97.

In making this argument, Appellants also ignore why the district court denied the first certification motion. Appellants filed an opposed "Motion to Continue/Extend Class Certification Briefing Deadlines," asking the district court to essentially stay the certification motion so they could conduct discovery before responding. ROA.8786–90. The district court accordingly ordered:

> [T]he Defendants' motion to continue/extend the briefing schedule (Doc. 6) on Plaintiff's Motion for Class Certification (Doc. 3) is GRANTED. The parties will have 120 days from today to complete discovery.

ROA.8852. The district court then denied the certification motion without prejudice "subject to be refiled after discovery is complete." ROA.8852–53. This denial, which was simply a case management order, allowed Giroir to continue to diligently pursue certification, which the court later granted. ROA.10535.

Appellants do not cite, nor could Giroir find, a single case finding mootness in Giroir's situation. The key factor for *McLaughlin* to apply is

44

whether a certification motion was pending when the individual claim became moot. That unquestionably happened here. There is no case law to suggest that, once that box is checked, the later timing or procedure of the district court's order certifying the class somehow breaks the *McLaughlin* relation-back chain.

### B. Appellants' Purported "Changed Circumstances" Cannot Moot the Case.

Next, Appellants claim that the case is moot because Giroir has "no personal interest in challenging a policy never applied to him." LeBlanc Br. 39. According to Appellants, they already fixed the problems that specifically harmed Giroir, and to the extent people are still being overdetained, they are being overdetained for a wide variety of different (or "changed") reasons, none of which common to Giroir (or other class members, for that matter). *Id.* at 38–40. This reasoning underpins Appellants' primary argument regarding Rule 23.[14] *See* LeBlanc Br. 15–16, 21, 25–26, 28, 50–54, 56–58, 62–66, 69.

This argument is not a proper mootness argument, but instead a merits argument in disguise. *See* LeBlanc Br. 39–40. In order to get there,

---

[14] Giroir explains why the district court's analysis was correct under Rule 23—including why he is an adequate class representative. *See infra* pp. 48–61.

Appellants ask the Court to bypass its review under Rule 23 and dismiss the case based on their perspective of the underlying merits and what they assume the facts at trial will ultimately show. *See id.* at 39 ("[A] court cannot enjoin . . . any alleged policy applied against him that no longer exists.").

Rule 23, however, "grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455, 465–66 (2013). As such, any "evaluation of the probable outcome on the merits is not properly part of the certification decision." *Id.* at 466 (citation and quotation marks omitted). For instance, the district court's decision explained that, to ultimately succeed, Giroir will have to prove that Appellants "had certain policies . . . that were applicable to all class members" (including himself) and that these policies "were the moving force of the overdetention crisis." ROA.10619–20. These issues, including whether such policies even exist, are still very much contested and being litigated in the district court.

That ongoing fight makes this case very different than the military COVID-vaccine policy that Appellants cite, *see* LeBlanc Br. 39–40 (citing

46

*U.S. Navy SEALs 1-26 v. Biden*, 72 F.4th 666, 669 (5th Cir. 2023)), where it was undisputed that the Navy rescinded the challenged policy and mooted the case. For that logic to apply here, the parties would have to agree that Appellants are no longer overdetaining inmates. While the class members wish that were the case, those answers will come only after trial. *See Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 152 (1982). The Court should reject Appellants' argument.

## C.     Overdetention Is Inherently Transitory.

Appellants also argue that the *McLaughlin* exception cannot apply because delayed release "is not *so inherently* fleeting" that the district court could not rule on a certification motion before an overdetained individual's claim becomes moot. *See* LeBlanc Br. 41–42. As this case shows, that is just not true.

To start, the "inherently fleeting" analysis "may rely on reasoned supposition." *J.D. v. Azar*, 925 F.3d 1291, 1310 (D.C. Cir. 2019); *c.f.* LeBlanc Br. 45 (suggesting that it was Giroir's "burden to show" the fleeting nature). For instance, in *Gerstein*, the Supreme Court "hypothesized events that 'may' occur, based on the 'practicalities' of the litigation at issue." *J.D.*, 925 F.3d at 1310 (quoting *Geraghty*, 445 U.S. at

47

404 n.11). As such, when common sense or experience says the time period is too short to resolve a class certification motion before the claims would become moot, the exception is satisfied. *See id.* at 1311 (finding that "roughly" 41 to 90 days on average was sufficiently short to be inherently fleeting).

Here, the relevant time period runs from when an overdetained individual files a putative class action suit for injunctive relief until release. *McLaughlin*, 500 U.S. at 51–52; *see also Genesis Healthcare Corp.*, 569 U.S. at 75–77. In Giroir's case, that window lasted just two days over a weekend. *See supra* pp. 11–12. That duration is certainly "inherently fleeting." *See McLaughlin*, 500 U.S. at 51 (applying the exception because the named plaintiffs' claims were likely mooted within 48 hours). It also reflects what happens in practice when an overdetained individual obtains counsel and provides notice—they are evaluated and released if they are, in fact, being overdetained.[15] *See J.D.*, 925 F.3d at

---

[15] To the extent Defendants characterize this as the "picking off" exception rather than the "inherently transitory" exception, *see* LeBlanc Br. 44, this Court has recognized the "picking off" exception post-*Genesis Healthcare*. *See Fontenot*, 777 F.3d at 751 (citing *Zeidman*, 651 F.2d at 1050–51). *See also Schelske v. Austin*, No. 6:22-cv-049, 2023 WL 5986462, at *16 (N.D. Tex. Sept. 14, 2023) (Hendrix, J.) (explaining that, under *Zeidman* and *Fontenot*, "a defendant may not prevent class certification by providing relief and 'pick[ing] off' named plaintiffs who would have otherwise served as representatives of a prospective class" because the Fifth Circuit "recognizes

241–43 (collecting pragmatic examples of fleeting claims, such as triggering detention hearings, bail hearings, or probable cause hearings).

To show otherwise, Appellants point to instances in which it has overdetained people for up to 337 days. LeBlanc Br. 43. But critically, *none* of these individual plaintiffs filed a class-action lawsuit while he was still incarcerated. *Crittindon v. LeBlanc*, 37 F.4th 177, 184–85 (5th Cir. 2022); *Parker v. LeBlanc*, 73 F.4th 400, 403 (5th Cir. 2023); *Hicks v. LeBlanc*, 81 F.4th 497, 501 (5th Cir. 2023); *McNeal v. LeBlanc*, 90 F.4th 425, 429 (5th Cir. 2024); *Buchicchio v. LeBlanc*, No. 23-30116, 2024 WL 4603272, at *3–4 (5th Cir. Oct. 29, 2024). As such, all of those plaintiffs would lack standing to sue for injunctive relief to begin with. And filing suit when the individual is no longer in custody certainly would not trigger a quicker review of the alleged overdetention. In this sense, Appellants are asking the Court to compare apples to oranges.

Even accepting Appellants' flawed premise, it is unreasonable to expect a district court to resolve class certification within 41 to 337

---

'no difference' between 'the defendant's purposive acts' and 'the naturally transitory nature of the controversy' when each precludes resolution of a class-action claim"); *Tellis v. Leblanc*, No. 18-0541, 2020 WL 1249378, *6–8 (W.D. La Mar. 13, 2020) (holding that both the inherently transitory and "picking off" exceptions apply in a case where the defendants have control of the custody of plaintiffs and through their actions can moot out plaintiffs' claims).

days.[16] Here, class certification took over four years to resolve, during which time Giroir diligently pursed his motion through numerous rounds of briefing and an evidentiary hearing. *See* ROA.10537. *See also J.D.*, 925 F.3d at 241–43. Indeed, Appellants themselves insisted—over 30 days after the complaint and certification motion were filed—that they needed months of discovery *before* they could even respond to the complaint, much less litigate class certification and allow the court to resolve the motion. *See* ROA.8786–90, ROA.8852–53.

As a result, like the Supreme Court hypothesized in *Gerstein*, there is no reason to believe that Appellants would continue detaining potential plaintiffs for more than a few days after filing suit, which would never allow time for the district court to rule on a class certification motion. This scenario meets the inherently transitory exception.

### D.    The Overdetention Policy Evades Review Despite the Certification of the *Humphrey* Damages Class.

Finally, Appellants claim the *McLaughlin* exception cannot apply because Giroir can recover money damages, rendering his claim for injunctive relief moot under *City of Los Angeles v. Lyons*, 461 U.S.

---

[16] According to the DOJ Report, individuals are being overdetained for a median length of 29 days. ROA.12355.

95(1989). LeBlanc Br. 40–41. And thus, Appellants say, the overdetention policy is not "evading review" because it can be challenged in *Humphrey*. *Id.* In making this argument, however, Appellants admit (as they must) that the availability of money damages (such as in *Humphrey*) does not moot a claim for injunctive relief when the policy is capable of repetition yet evading review. *Lyons*, 461 U.S. at 109. *See also* LeBlanc Br. 41.

The Supreme Court has squarely rejected Appellants' application of *Lyons*. *McLaughlin*, 500 U.S. at 51. In *McLaughlin*, the county argued that "at least to the named plaintiffs, there is no standing because it is too late for them to receive a prompt hearing and, under *Lyons*, they cannot show that they are likely to be subjected again to the unconstitutional conduct." *Id.* The Court, however, "easily distinguished" the challenged policy "from *Lyons*, in which the constitutionally objectionable practice ceased altogether before the plaintiff filed his complaint." *Id.* at 51–52. The Court continued: "Our cases leave no doubt, however, that by obtaining class certification, plaintiffs preserved the merits of the controversy for our review." *Ibid.* As such, this case is not

moot under *McLaughlin*—and as the Supreme Court already said, *Lyons* cannot change that.[17]

## IV. The District Court Did Not Abuse Its Discretion Applying Rule 23's Factors to the *Giroir* Class.

Finally, Appellants also challenge the merits of the class certification order as overbroad, undefined, and lacking adequacy, commonality, typicality, or viability. But Appellants are wrong across the board. Whether Appellants' arguments are new (and defaulted) or old (and rejected by the district court), for the reasons below, they all lack merit. In the end, the district court did not abuse its discretion in its application of Rule 23.

### A.    *Giroir* is an Adequate Representative for His Class.

After the *Giroir* class was certified, Appellants argue—for the first time on appeal—that Giroir is inherently an inadequate representative because he cannot be a member of an injunctive class and also a damages class. LeBlanc Br. 46–47. Appellants also imply that DPSC has

---

[17] Defendants' reliance on *Alvarez v. Smith*, 558 U.S. 87 (2009) equally fails because, as the Supreme Court explained in that case, the "District Court denied the plaintiffs' class certification motion" and "[t]he plaintiffs did not appeal that denial." 558 U.S. at 92–93. So when *Alvarez* applied *Lyons*, it was doing so only for the individual plaintiffs. *Id.* As *McLaughlin* makes perfectly clear, that makes all the difference. 500 U.S. at 51.

implemented "successful remedies" to address its endemic overdetention issue, and as such, that the problems plaguing Giroir's release have been "solved," and the release process of today is fundamentally different than during his overdetention. LeBlanc Br. 48–49. [18] Both arguments are defaulted and wrong on the merits.

### 1. Appellants' Adequacy Argument is Waived Because It Was Not Raised Before the District Court.

Appellants waived their new adequacy argument by not raising it in the district court. As the district court noted, Appellants were silent on Giroir's adequacy in both their pre- and post-hearing briefing on class certification. *See* ROA.10610, ROA.10108, ROA.10226–35, ROA.10236–38. In fact, before the *Giroir* class was certified, the only adequacy objections from Appellants were a "pro forma and borderline frivolous" paragraph in opposition to the class certification motion. *See* ROA.10611, ROA.8971. Now, after its previous arguments failed before the district court, Appellants raise new objections. But "arguments not raised before

---

[18] Appellants' speculation continues throughout their Rule 23 analysis. For example, Appellants also claim that Giroir is an inadequate representative because his release process is "fundamentally altered" from current practices, so he cannot represent individuals who were injured based on a release process different than his. LeBlanc Br. 49, 63. But whether considered part of the adequacy or typicality analysis, this "trust-us-it's-fixed" argument fails. *See infra* pp. 55–60.

the district court are waived and will not be considered on appeal." *Def. Distributed v. Grewal*, 971 F.3d 485, 496 (5th Cir. 2020); *In re Deepwater Horizon*, 739 F.3d 790, 813 (5th Cir. 2014) .

To be sure, the district court cannot abuse its discretion by not considering an argument that was never raised. *See 50-Off Stores, Inc. v. Banques Paribas (Suisse), S.A.*, 180 F.3d 247, 258 (5th Cir. 1999); *United States v. Hawkins*, 165 F.4th 442, 455 (6th Cir. 2026) (collecting cases explaining that a court cannot "abuse[ ] its discretion by failing to consider an argument that Defendant did not raise"). This rule exists for good reason. To entertain these new novel arguments on appeal would permit Appellants to "[try the] case on an entirely different theory" than the arguments before the district court. *Celanese Corp. v. Martin K. Eby Constr. Co.*, 620 F.3d 529, 531 (5th Cir. 2010). Appellants "should have raised these arguments timely if [they] intended to rely on them in this court." *Grewal*, 971 at 496. The Court should reject this argument.

> ### 2.    Conflicts Alleged in *Giroir* are Speculative and Meritless, and There is no Inherent or Active Conflict Between *Humphrey* and *Giroir* Classes.

Even if Appellants' argument about alleged conflicts were not waived, the district court did not abuse its discretion by omitting from its

opinion a senseless inquiry into whether *Giroir* conflicts with *Humphrey*. As a general rule, "not all conflicts of interest will defeat adequacy." *Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 737 (5th Cir. 2023). Rather, in order to defeat adequacy, "a conflict must be manifest at the time of certification rather than dependent on some future event or turn in the litigation that might never occur." *Beaver v. Omni Hotels Mgmt. Corp.*, No. 20-cv-00191, 2023 WL 6120685, at * (S.D. Cal. Sep. 18, 2023) (cleaned up). In contrast, when the alleged conflict of interest is too speculative, that sort of hypothetical conflict does not render a class representative inadequate. *See In re EDS Securities Litigation*, 226 F.R.D. 559, 569 (E.D.Tex.2005) (holding that "potential complications that may arise during the damages phase of a trial do not bar a finding of adequacy").

Here, Appellants' alleged conflict is too speculative to defeat certification. Appellants suggest that, at some point in the future, *Humphrey* will necessarily undermine, or even sacrifice, *Giroir*'s claims for monetary gain by alleging DPSC has remedied its issues and that DPSC could have done so sooner. LeBlanc Br. 48–49. But to even consider that future, hypothetical conflict, the district court would have needed to

55

resolve the ultimate merits of the case. That itself would have been an abuse of discretion because it is well-established that a district court cannot inquire or anticipate the outcome of the suit when ruling on class certification. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); Advisory Committee's 2003 Note on subd. (c)(1) of Fed. Rule Civ. Proc. 23, 28 U.S.C. App., p. 144; *see Payne v. Travenol Lab'ys, Inc.*, 673 F.2d 798, 811 (5th Cir. 1982) (district court may deny certification if conflict is "actual at the outset of the trial"). Indeed, a district court has zero authority to "conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974).

But here, Appellants' "conflict" argument requires several speculative leaps—not just for *Giroir*, but also for *Humphrey*. For Appellants' argument to work, they would need the *Humphrey* class (not *Giroir*) to argue consecutively that: (1) DPSC has meaningfully implemented changes to its release processes, (2) these changes have reasonably mitigated the risk of harm, and (3) DPSC could have implemented such changes sooner. LeBlanc Br. 47–49. None of those things have happened. As such, the district court did not abuse its

56

discretion by failing to predicate its decision on a cascading series of hypothetical events.

To avoid that result, Appellants say that there is some conflict inherent to *Giroir* as it relates to *Humphrey*. But there is not, and other courts have failed to find an inherent conflict between members of injunctive and damages classes. *See Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 620 (9th Cir. 2010) (declining to find damages classes and injunctive classes to be necessarily in conflict) (rev'd on other grounds) 564 U.S. 338 (2011); see also *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1046 (N.D. Miss. 1993) (finding certification under both rules 23(b)(2) and 23(b)(3) appropriate).

Finally, if a conflict were ever to arise, the Federal Rules governing class certification provide a remedy for the district court *at that time*. *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment." ); *Angell*, 67 F.4th at 739 n.6 (noting that a district court may "of course decertify" a class if speculative or underdeveloped claims *later gain support*). Appellants' adequacy arguments should be rejected.

**B.    The Class Satisfies the Requirements of Rule 23(b)(2).**

The district court properly exercised its broad discretion in certifying the class under Rule 23(b)(2). An injunction can provide class-wide relief when "(1) the "class members [] have been harmed in essentially the same way," and (2) "the injunctive relief sought [is] specific." *M.D. v. Perry*, 675 F.3d 832, 845 (5th Cir. 2012) (cleaned up). Additionally, this Court has made clear that courts should follow a "general rule encouraging liberal construction of civil rights class actions," and that "the 23(b)(2) class action is an effective weapon for an across-the-board attack against systematic abuse." *Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975). Additionally, Rule 23(b)(2) class actions have been frequently used (and approved) in cases challenging relatively short periods of detention or detention of those with conditions yet to be ascertained, such as disability or indigence. *See, e.g., Gerstein*, 420 U.S. at 110–11; *Hernandez v. County of Monterey*, 305 F.R.D. 132, 149 (N.D. Cal. 2015); *Bumgarner v. NCDOC*, 276 F.R.D. 452, 454 (E.D.N.C. 2011); *Cole v. Livingston*, Civil No. 14-1698, 2016 WL 3258345 (S.D. Tex. June 14, 2016); *Walker v. City of Calhoun*, No. 15-170, 2016 WL 361580 (N.D. Ga. Jan. 28, 2016).

This Court has also explained that class claims may be based on allegations that a state "engages in a pattern or practice of agency action or inaction—including a failure to correct a structural deficiency within the agency." *M.D.*, 675 F.3d at 847. For instance, in *M.D.*, this Court explained that these types of classes are appropriate for injunctive relief so long as the relief appropriately settles "the legality of the [State's] behavior with respect to the class as a whole." *Id*. at 847–48 (internal citation omitted).

The *Giroir* class obeys all these principles. This is a civil rights class action seeking declaratory and injunctive relief against systemic overdetention occurring as a result of DPSC policies or lack thereof. Despite the relatively short periods of detention imposed on class members, it is still overdetention, and results from DPSC's failure to correct its own structural deficiencies. Every class member has suffered that same injury. To remedy that systemwide harm, Giroir sought an order requiring DPSC to implement concrete procedures to calculate sentences and release eligible individuals within 48 hours. *See* ROA.8428–29. This class-wide relief squarely fits Rule 23(b)(2).

59

### 1. All Class Members Were Harmed by the Same DPSC Practices.

For the same reasons commonality is satisfied, the first requirement of Rule 23(b)(2) is met. Commonality is satisfied "when there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." *Lightbourn v. Cty. of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997). Because Giroir has "identified a common practice or policy"—DPSC's release process—a "single injunction barring or modifying that course of that behavior will, in the ordinary course of things, provide relief to the members of the class." *Dockery v. Fischer*, 253 F. Supp. 3d 832, 839 (S.D. Miss. 2015). Indeed, DPSC's practice of failing to release people on time is a general practice that affects *all* persons sentenced to DPSC custody who remain incarcerated past their release dates. Individual differences among class members are irrelevant, as the requested injunctive relief would not require individualized determinations. An injunction addressing DPSC's systemic failure to ensure timely release would therefore protect all class members and satisfies Rule 23(b)(2). *See Dockery*, 253 F. Supp. 3d at 856 ("As the types of injunctive relief requested by Plaintiffs would not require that the Court adjudicate the individual class members' needs or

circumstances, . . . the injunctive relief requested by Plaintiffs satisfies Rule 23(b)(2).")

### 2. Injunctive Relief Sought is Specific Enough to Craft a Final Order.

Giroir has also satisfied Rule 23(b)(2)'s specificity requirement. This element "requires plaintiffs to 'give content' to the injunctive relief they seek so that final injunctive relief may be crafted to describe in reasonable detail the acts required." *Yates v. Collier*, 868 F.3d 354, 368 (5th Cir. 2017) (cleaned up); *M.D.*, 675 F.3d at 835.

At the certification stage, plaintiffs need not spell out "every jot and tittle of injunctive relief." *Yates*, 868 F.3d at 368; *see also Valentine v. Collier*, No. 4:20-cv-1115, 2020 WL 3491999, at *14 (S.D. Tex. June 27, 2020). Rather, they must simply give enough content to "how a court could define or enforce meaningful injunctive relief." *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 525 (5th Cir. 2007).

Here, the proposed relief describes in detail how the district court could "restrain [DPSC] from violating" class members' rights. *See Ward v. Hellerstedt*, 753 F. App'x 236, 249 (5th Cir. 2018). Giroir asked for, among other things: "An order and judgment requiring [Appellants] to calculate sentences and release as soon as reasonably feasible, and in no

event longer than 48 hours after the person is sentenced, for all persons sentenced to the custody of the [DPSC] who are eligible for immediate release upon sentencing" ROA.9633. Indeed, as the district court noted: "it should be quite apparent from pleadings, briefings, expert testimony, and oral argument exactly what [the class members] seek." ROA.10648.

## C. Appellee Presented Sufficient Evidence of Commonality and Typicality Within the Class.

As a final point, Appellants argue that a class encompassing every incarcerated person "housed across 102 facilities and 64 parishes" is necessarily lacking in commonality, LeBlanc Br. 38, and that the errors and delays that harmed Giroir are not typical or representative of the errors and delays of the overdetained class more generally. LeBlanc Br. 64–65. Appellants again fail to consider that while class members may have been housed in different facilities, they all faced common unresolved issues stemming from a singular source: DPSC.

### 1. Commonality.

"The test for commonality is not demanding." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999).[19] Commonality is

---

[19] Like the rest of the 23(f) factors, it is only reviewed for abuse of discretion. *Cleven,* 20 F.4th at 176.

satisfied "when there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." *Lightbourn v. Cty. of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997). Making a determination on that "one issue" or contention, "which means [determining] its truth or falsity," must be "central to the validity" of the class claims. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 338 (2011).

Giroir raises several legal and factual questions, many of which would be dispositive of this suit. ROA.10612. Simple factual assertions, like whether DPSC is aware of their pattern of overdetention, or whether DPSC is responsible for calculating release dates on the day of sentencing, are the exact types of questions which, when answered, will establish the validity all class members' claims. ROA.10612. Those common questions satisfy the low bar for commonality.

### 2. Typicality.

"Like commonality, the test for typicality is not demanding." *Mullen,* 186 F.3d at 625. It merely requires the claims of a class representative to be typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). Typicality focuses on the similarity between the named plaintiffs' legal and remedial theories and the legal and remedial theories of those whom they

purport to represent. *Lightbourn*, 118 F.3d at 426. "A complete identity of claims is not required; rather, the critical inquiry is whether the named plaintiff's claims have the same essential characteristics of those of the putative class." *Angell*, 67 F.4th at736 (cleaned up). Indeed, "[i]f the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002) (quoting *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001)).

Giroir easily meets this low threshold, too. As the district court noted, all class members share the same legal theory in claiming "that LeBlanc's policies caused overdetentions and that LeBlanc was deliberately indifferent to the deficiencies. A similar course of conduct by LeBlanc pervades these claims." ROA.10620. Significantly, complaints of systemic processing delays have satisfied typicality concerns in other courts as well. *See, e.g.*, *Gladney-Chase v. Collins*, 38 Vet. App. 216, 221 (U.S. 2025); *Ebanks v. Shulkin*, 877 F.3d 1037, 1038-40 (Fed. Cir. 2017); *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993).

Appellants briefly contest typicality, asserting that Giroir's claims apply concern only DPSC's pre-electronic submission release process.

64

LeBlanc Br. 63–64; La. C.Cr.P. art. 892(C)(2). That is incorrect. Giroir's preclass documents were in fact submitted electronically to DPSC, ROA.8980, and there is no current mandate for electronic submission. *See supra* pp. 8–11. The district court did not abuse its discretion in finding typicality.

## CONCLUSION

For the above-mentioned reasons, the Court should affirm the district court's order certifying the class.

Dated: April 6, 2026.                    Respectfully submitted,

/s/ *Cecelia Trenticosta Kappel*
CECELIA TRENTICOSTA KAPPEL
**THE PROMISE OF JUSTICE INITIATIVE**
1024 Elysian Fields Avenue
New Orleans, LA 70117
Tel: (504) 529-5955
*ctkappel@defendla.org*

*COUNSEL FOR PLAINTIFF-APPELLEE & THE PROPOSED CLASS*

65

## CERTIFICATE OF SERVICE

I, Cecelia Trenticosta Kappel, a member of the Bar of this Court and counsel for appellee certify that, on April 6, 2026, a copy of Appellee's Brief was filed with the Clerk through the Court's electronic filing system. I further certify that all parties required to be served have been served.

/s/ *Cecelia Trenticosta Kappel*
CECELIA TRENTICOSTA KAPPEL

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this petition complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) because it contains 13,000 words; and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

/S/ *Cecelia Trenticosta Kappel*
CECELIA TRENTICOSTA KAPPEL

Dated: April 6, 2026.

67